CHEMICAL BANK AND TRUST COMPANY, as Trustee under a Trust Agreement Executed by CHARLES N. RAYMOND April 4, 1899, Plaintiff, *v.* VICTORIA FORREST REYNAUD and Others, Defendants.*

Supreme Court, New York County, January 6, 1933.

*Patterson, Eagle, Greenough & Day,* for the plaintiff.

*Leonard & Walker,* for Marie Raymond Maxwell and another, as executrix, etc., defendants.

*Smith & Bowman,* for Victoria Forrest Reynaud.

*Vincent Gilroy,* for Joseph Remi Reynaud, guardian *ad litem* for infant, Raymond Lucien Reynaud.

* Affd., 241 App. Div. 813.

*Davis, Polk, Wardwell, Gardiner & Reed,* for May Forrest Bradley and others.

*Carroll H. Brewster,* guardian *ad litem* for Eileen Fairfax Thomson and Catherine Bradley Thomson.

SHIENTAG, J.  The final account of the trustee of a voluntary trust created *inter vivos* in 1899 has been surcharged by the referee with respect to three items: (1) Loss resulting from the alleged negligent retention of certain bonds; (2) unexplained payment of a sum of money to the settlor; (3) a payment to a firm of accountants for services performed in connection with the preparation of the final account.  The settlor of the trust died in 1916.

I. The non-legal character of the securities did not cause their retention to be at the risk of the trustee.  Negligence must be predicated on something more.  The trust indenture directed the trustee to hold these securities or to sell them for reinvestment or for final disposition, and provided that it was " the purpose of this indenture to create in the said trustee a *liberal discretion* concerning the change of such investments and reinvestments arising from such change and to hold it liable only for neglect or bad faith in the discharge of its duties."  By the very terms of the instrument itself, the trustee is not only permitted to hold the securities which were delivered to it, but also to exercise a liberal discretion with respect to sale and reinvestment.

The trustee retained the identical securities which the settlor delivered to it.  These securities were non-legal, but they were not purchased by the trustee.  It would be fixing a rule too harsh and too arbitrary to hold that a trustee receiving specified securities from a living settlor is expected to dispose of them merely because they are not legal investments for trust funds.  If the settlor had wanted a trust consisting of legal investments, he would have delivered such investment to the trustee.  The fact that the settlor delivered non-legal investments, taken in connection with the declarations made in the trust indenture, is upon its face a declaration that the settlor not only did not intend to create a trust composed of legal investments, but that he did not intend to impose upon the trustee any duty or obligation greater than that exercised by a diligent and prudent man; certainly no care greater than that which he himself exercised in his administration of his business affairs.

A trustee is not required to act at its peril in a situation presented by this trust indenture.  It is required " to employ such diligence and such prudence in the care and management, as in general, prudent men of discretion and intelligence in such matters, employ

in their own affairs." (*King* v. *Talbot*, 40 N. Y. 76, 85, 86.) In determining whether the acts of a trustee have been prudent within the meaning of the rule, we must " look at the facts as they exist at the time of their occurrence, not aided or enlightened by those which subsequently take place." (*Purdy* v. *Lynch*, 145 N. Y. 462, 475.) "A wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by." (*Costello* v. *Costello*, 209 N. Y. 252, 262.) (See *Matter of Clark*, 257 N. Y. 132; *Matter of Parsons*, 143 Misc. 368; *Matter of Storts*, 142 id. 54.)

In order to establish negligence on the part of the trustee, it must be shown by the contesting party that the trustee did not conduct himself in accordance with the rules heretofore enunciated. Bad faith is not charged. The record does not disclose negligence on the part of the trustee in retaining the non-legal investments. Its judgment might have been erroneous and so established by subsequent events. It cannot be said to have acted, however, other than as a diligent investor would have acted. An examination of the record discloses that interest and dividends were regularly paid up to October, 1907, on the bonds in question. The assets of the company exceeded its liabilities by more than $55,000,000 each year during the period from 1903 to 1907. In fact, the assets were in excess of double the amount of all debts. The net earnings between 1897 and 1901, as well as the net income, showed a steady increase. The net earnings in 1904, 1905, 1906 were greater than in 1903, and the gross earnings during the same years were likewise greater. The market quotations did not show a gradual decline of the bonds. The high for 1906 was only seven points less than the high for 1899, which was the highest previous point, and the low for 1906 was only six points less than the low for 1899. Even in the receivership year of 1907 the bonds did not go below par and they went as high as $108\frac{3}{4}$, which was only five and one-quarter points lower than they had sold for in 1899. Specifically, the bonds were higher in 1906 than they were in 1903.

The conclusion to be drawn from these conceded facts, therefore, is that the reported condition of the company was not unsound and the trustee was not obligated, in the exercise of reasonable care and diligence, to dispose of the bonds. It is stipulated that in 1907 these bonds were held in large numbers by the largest and best insurance companies and that even at and subsequent to the receivership they were held by numerous banks, trust companies, colleges, executors, committees and testamentary trustees. These facts are some evidence of what prudent men were doing in the circumstances.

Much has been made of the fact that there were published charges of fraud and mismanagement within the company. Such charges, however, were not in and of themselves sufficient to oblige the trustee to sell the bonds. It is clear that if these published charges had in fact led careful and prudent investors to dispose of the bonds, the market would have gone to smash. On the contrary, it held up well and " prudent men of discretion and intelligence in such matters " did not dispose of their bonds, as hereinbefore indicated.

The argument is made that even if the trustee was not negligent in disposing of the bonds up to 1907, it was negligent in failing to dispose of them after the reorganization of the railway company. Such argument is based neither on reason nor fact. The trustee under the terms of the trust agreement, having been entitled to continue to hold the non-legal bonds, it cannot be held as a matter of law that it was bound to dispose of the non-legal securities of the reorganized company, obtained in their place. It is liable only for negligence in their retention. The company was finally reorganized in 1912. Upon the exchange of the old securities for the new, according to market quotations, the trustee received bonds of substantial parity in value. The trustee had a right to feel, as a prudent man would have felt, that upon reorganization the condition of the company would be stronger. As a matter of fact, the market quotations show that in January, February and March, 1912, the bonds ranged from a low of $99\frac{1}{2}$ to a high of 102, and the value of the bonds was then from $3,000 to $3,060. Subsequent events show that prudent men held these new bonds and continued to hold them from 1912 down to 1929. In that year seven insurance companies, including the Mutual and New York Life, held a total of $1,195,000 of the bonds; banks and trust companies, including three of the largest in the city, and Harvard University, held these securities.

Under the facts in this case, I am unable to find that the trustee was negligent in the performance of its trust.

II. The unexplained payment of $762.50 made by the trustee to the settlor should not properly be surcharged against the former. Under the original trust indenture there were delivered to the trustee certain bonds and a sum of money in cash, and subsequent to the execution of the trust and to the payment of $762.50, the settlor delivered $10,000 to the trustee. Assuming that the unexplained payment by the trustee to the settlor was wrongful, it was recovered by the trustee when the additional sum was paid over to it by the settlor. If the receipt of the $762.50 by the settlor was wrongful, it is only fair to assume that being under an obliga-

tion to repay it, he did so when he delivered the additional money to the trustee.

III. With respect to the payment made by the trustee to accountants in connection with the preparation of the accounts, the surcharge was a proper one. There was nothing difficult or extraordinary about the account. It concerned a few transactions which the large bookkeeping and accounting department of a trust company could properly and without difficulty handle.

Submit findings of fact, conclusions of law and judgment on notice, in accordance with this determination, in both actions. Allowances will be fixed in the judgment.